AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | FILED |
|---|---|
| | May 25 2021 |
| | SUSAN Y. SOONG |
| | CLERK, U.S. DISTRICT COURT |
| | NORTHERN DISTRICT OF CALIFORNIA |
| | OAKLAND |

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| JAVIER CASTRO BANEGAS-MEDINA, ELMER ROSALES-MONTES, JOSE IVAN CRUZ-CACERES, JIHAD JAD TAWASHA, MARIO ISABEL CRUZ-CALIX (cont'd on attached sheet) | ) ) ) ) ) |

Case No.   4:21-mj-70900-MAG

*Defendant(s)*

# CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___April 21, 2021 to May 19, 2021___ in the county of ___Alameda___ in the ___Northern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(b)(1)(B) | Conspiracy to Distribute More than 40 Grams of Fentanyl (against Castro, Rosales-Montes, Cruz-Caceres, Cruz-Calix, and Fernandez-Reyes) |
| 21 U.S.C. § 841(a)(1) & (b)(1)(B) | Possession with Intent to Distribute More than 40 Grams of Fentanyl (against Tawasha and Borges) |
| 21 U.S.C. § 841(a)(1) & (b)(1)(C) | Possession with Intent to Distribute Fentanyl (against Laughren) |

This criminal complaint is based on these facts:

See attached affidavit of FBI TFO Joshua Gilfry.

☑ Continued on the attached sheet.

Approved as to form   /s/ Noah Stern
AUSA   Noah Stern

/s/ Joshua Gilfry
*Complainant's signature*

Joshua Gilfry, FBI TFO
*Printed name and title*

Sworn to before me by telephone.

Date:   05/24/2021

*Judge's signature*

City and state:   Oakland, California

Hon. Kandis A. Westmore, U.S. Magistrate Judge
*Printed name and title*

YENY LIZETH FERNANDEZ-REYES (A/K/A YENY FERNANDEZ), HEATHER RAE
BORGES, and WILLIAM JOSEPH LAUGHREN JR.

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Joshua Gilfry, a Task Force Officer ("TFO") of the Federal Bureau of Investigation ("FBI"), being duly sworn, state:

## I.  INTRODUCTION

1.      I submit this affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for and arrest warrants authorizing the arrest of the following individuals (collectively the "Target Subjects"):

   a.   Javier CASTRO Banegas-Medina ("CASTRO"), Elmer ROSALES-MONTES ("ROSALES-MONTES"), and Jose Ivan CRUZ-CACERES ("CRUZ-CACERES") for conspiracy to distribute more than 40 grams of a mixture and substance containing a detectable amount of N-phenyl-N- [ 1- ( 2-phenylethyl) -4-piperidinyl ] propanamide (commonly known and hereinafter referred to as "fentanyl"), in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B)(vi) beginning on a date unknown but no later than April 21, 2021 and continuing through May 19, 2021 in the Northern District of California;

   b.   Jihad Jad TAWASHA ("TAWASHA") for possession with intent to distribute more than 40 grams of a mixture and substance containing fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(vi), on or about April 27, 2021, in the Northern District of California;

   c.   Yeny Lizeth FERNANDEZ-REYES ("FERNANDEZ-REYES," a/k/a Yeny Fernandez) and Mario Isabel CRUZ-CALIX ("CRUZ-CALIX"), for conspiracy to distribute more than 40 grams of a mixture and substance containing fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B)(vi) beginning on a date unknown but no later than April 30, 2021 and continuing through May 11, 2021 in the Northern District of California;

   d.   Heather Rae BORGES ("BORGES"), for possession with intent to distribute more than 40 grams of a mixture and substance containing fentanyl, in violation

of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(vi), on or about May 6, 2021, in the Northern District of California; and

e.   William Joseph LAUGHREN Jr. ("LAUGHREN"), for possession with intent to distribute a mixture and substance containing fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C), on or about May 12, 2021, in the Northern District of California.

## II.  SOURCES OF INFORMATION

2.      This affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrants.  I have not included every fact known to me concerning this investigation.  Instead, I have set forth only the facts necessary to establish probable cause that the violations of the federal laws identified above have occurred.

3.      I have based my statements in this affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by other agents, law enforcement officers, and draft translations of intercepted communications prepared by Spanish-speaking monitors, information provided by reports of other law enforcement officers, information gathered through law enforcement surveillance efforts, information provided by photographic and/or video-recorded evidence, and information provided by records and databases.  I believe these sources to be reliable.  Where I refer to conversations and events, I often refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted.  This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds.

## III. AFFIANT BACKGROUND

4.      Your affiant, Joshua Gilfry, has been a police officer since September 24, 2012.  I am employed with the Concord Police Department ("CPD") and I am a sworn peace officer within the meaning of California Penal Code Section 830.1.  I am currently assigned to the Federal Bureau of Investigation (hereinafter "the FBI") Safe Streets Violent Gang Taskforce.  I

am cross designated as a Special Federal Officer / Special Deputy US Marshal of the United States Department of Justice, deputized pursuant to Title 21 and Title 18.  My primary responsibilities as a Safe Streets Taskforce Officer is to identify and investigate trends in violent crimes committed by members of criminal street gangs throughout Contra Costa County.

5.      Since being sworn as a FBI Task Force Officer (hereinafter "TFO"), I have received training and/or gained professional experience in: basic narcotic investigations, familiarization with U.S. narcotics laws, financial investigations and money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance, informant development, Title III investigations, and undercover operations.

6.      During the course of my law enforcement career, I have been involved in investigations of numerous federal and state criminal offenses.  I have participated in numerous investigations of illicit drug trafficking organizations.  These investigations have included the use of confidential sources (CSs), undercover agents, and sources of information (collectively "Sources"); toll records; physical surveillances; and the execution of search warrants.  These investigations have also included the unlawful importation of controlled substances, possession with intent to distribute controlled substances, and the distribution of controlled substances, and the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses.  These investigations have resulted in numerous state and/or federal prosecutions of individuals who have possessed, imported, or distributed controlled substances, as well as the seizure of those illegal drugs and the proceeds from the sale of those illegal drugs.

7.      I have participated in surveillance of narcotics traffickers.  During these surveillances, I have personally observed narcotics transactions, counter-surveillance techniques, and the methods that narcotics traffickers use to conduct clandestine meetings.  I have participated in state and federal investigations in which court-authorized wire interceptions were used.

8.      I have participated in Organized Crime Drug Enforcement Task Force (OCDETF) investigations.  The OCDETF program is part of the United States Attorney General's drug strategy to reduce the availability of drugs by disrupting major trafficking organizations through joint-agency collaboration.

9.      I have been involved in the execution of numerous state and/or federal narcotics-related search warrants.  As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances.  I am familiar with the appearance of fentanyl, heroin, cocaine, methamphetamine, marijuana, MDMA, and other controlled substances.  I am familiar with and aware of the terminology used by narcotics traffickers concerning narcotics and narcotics dealing.

10.     I have interviewed numerous drug dealers, users, and confidential informants, and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, the use and meaning of coded language and the concealment of assets.  I have become familiar with the manner in which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds.  I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

11.     Prior to my transfer to the FBI Safe Streets Task Force, I was a detective in the CPD Violence Suppression Unit. My primary role in this capacity was to investigate narcotic and gang crimes within Contra Costa County.

12.     Prior to my assignment in the Violence Suppression Unit, I served on the Special Enforcement Team (SET).  SET's primary duties include street-level narcotics, prostitution, and gang crimes.  I also worked uniform patrol and am a current member of the Special Weapons and Tactics (SWAT) team.

13.     I attended the Contra Costa County Sheriff's Office P.O.S.T. Accredited Police

Academy in Pittsburg, California. The P.O.S.T. Academy includes 1,020 hours of training, with roughly 40 hours devoted to identifying controlled substances and understanding the laws pertaining to controlled substances. I attended an 80-hour Robert Presley Investigation (ICI) Major Drug Investigation Course.

14.     During my career, I have conducted preliminary and follow-up investigations into a variety of crimes. The investigations involved preparing police reports, collection of evidence, arresting suspects, interviewing victims and witnesses, interrogating suspects, and testifying in court proceedings. The crimes investigated include being under the influence of a controlled substance, possession of controlled substances, and possession and transportation of controlled substances.

15.     I have written and assisted with the execution of search warrants that have resulted in the finding and collecting of the desired evidence sought in the warrants related to illegal narcotics possession and possession for sales. I have arrested numerous subjects for being under the influence of a controlled substance, possession of a controlled substance, and possession of a controlled substance for sales.

16.     I have testified five times as an expert in the identification of heroin as well as the sale of heroin in Contra Costa County Superior Court, in California, and two occasions as an expert in the identification of methamphetamine as well as the sale of methamphetamine. I have a good working knowledge of controlled substances and related crimes based upon the foregoing.

17.     I am familiar with the facts and circumstances of the investigation through my personal participation. I have also learned other things about this investigation from fellow law enforcement officers and agents. Unless otherwise noted, wherever, in this affidavit, I assert that a statement was made, the information was provided by a FBI agent or task force officer, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement.

18.     I am an investigator and law enforcement officer of the United States within the

meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law, including the Target Offenses.

## IV. APPLICABLE STATUTES

19.     Title 21, United States Code, Section 846 prohibits, among other things, attempting or conspiring to distribute, possess with intent to distribute, or manufacture a controlled substance, including fentanyl.

20.     The elements of a violation of conspiracy to distribute fentanyl (21 U.S.C. §§ 846, 841(a)(1) an (b)(1)(B)(vi)) are as follows: (1) there was an agreement between two or more persons to distribute fentanyl, and (2) the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose, and (3) the conspiracy involved 40 grams or more of a mixture or substance containing fentanyl.

21.     Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(vi) prohibits a person from knowingly possessing with intent to distribute forty grams or more of a mixture or substance containing a detectable amount of fentanyl. Section 841(b)(1)(C) prohibits a person from knowingly possessing with intent to distribute any amount of a mixture or substance containing a detectable amount of fentanyl.

22.     The elements of a violation of possession with intent to distribute forty grams or more of fentanyl (21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi)) are as follows: (1) the defendant knowingly possessed forty grams or more of a mixture or substance containing a detectable amount of fentanyl, and (2) the defendant possessed it with the intent to distribute it to another person. The elements of a violation of section 841(b)(1)(C) are the same except there is no requirement that the amount of the mixture or substance containing fentanyl be more than forty grams.

## V. STATEMENT OF PROBABLE CAUSE

### A.     Overview of Investigation

23.     The FBI, Drug Enforcement Administration ("DEA"), and CPD (collectively, the "Investigative Agencies"), are investigating CASTRO and members of his drug trafficking organization (hereinafter referred to as the "CASTRO DTO"), which distribute suspected fentanyl[1] in the Bay Area.  The CASTRO's drug trafficking activities are largely based in Oakland and San Leandro, California, but his re-distributors/customers[2] are located in the Northern District of California and beyond, as detailed below.

24.     On April 21, 2021, the Honorable Jon S. Tigar signed an order authorizing the interception of wire and electronic communications over two telephone lines used by CASTRO (referred to herein as the "Target Telephones").  Agents subsequently began intercepting communications to and from CASTRO via the Target Telephones.  Through the wire interceptions, surveillance, and other investigative activities, investigators learned that CASTRO conspired with ROSALES-MONTES and CRUZ-CACERES to distribute large amounts of fentanyl to numerous re-distributors, who purchase fentanyl from CASTRO to distribute it to others, including TAWASHA, FERNANDEZ-REYES, CRUZ-CALIX, BORGES, and LAUGHREN.

#### 1.     Fentanyl is a Highly Potent and Dangerous Narcotic

25.     Based on my training and experience, I know that fentanyl, a Schedule II controlled substance, is a highly potent synthetic opioid.  It is about 50 times stronger than heroin

---

[1] As detailed in subsequent sections of this Affidavit, law enforcement intercepted numerous deliveries of suspected fentanyl, which later tested presumptively positive for the presence of the controlled substance, by the CASTRO DTO and its re-distributors.  However, when I refer generally to wiretap calls and the overall investigation, I will often use the term "suspected fentanyl" herein in an abundance of caution.  Nevertheless, I believe the CASTRO DTO operates either largely or exclusively in fentanyl trafficking based on the investigation to date.  Further, I know that is unlikely that re-distributors/customers of the CASTRO DTO would continue to place additional orders if the distributed substance was a sham substance.

[2] The term "re-distributors" is used herein to reflect customers that purchased suspected fentanyl from the CASTRO DTO in significant quantities or frequencies consistent with re-selling fentanyl to other customers, as opposed to user-quantities, during the wiretap investigation to date.

and about 100 times stronger than morphine.  Fentanyl can be distributed in many forms, including, powder, patches, and mixed into counterfeit pills.  Data compiled by the DEA shows that availability of fentanyl in the United States has drastically increased from 2013 to the present.[3]  According to the Centers of Disease Control and Prevention ("CDC") in 2019, opioids were involved in 49,860 overdose deaths.[4]  Synthetic opioids, such as fentanyl, accounted for nearly 73% of all opioid-involved deaths in 2019.  Two out of three of those overdoses involved synthetic opioids such as fentanyl.[5]  According to the CDC data, the largest increase in death rates from 2018 to 2019 involving synthetic opioids, 67.9%, occurred in the Western United States.  As described below, the CASTRO DTO supplies fentanyl in powder form and moves large quantities of this narcotic.

26.     Based on my training and experience, and my involvement in this investigation, I know that fentanyl is often referred to by drug traffickers by the color emitted when the drug is burnt.  For example, some fentanyl emits a blue color when lit.  This is often referred to by drug traffickers and users as "blue" or "azul" (i.e., the Spanish word for blue).  I also know that other varieties/strength of fentanyl are commonly referred to by drug dealers as "yellow," "pink," "purple," and "green."  This investigation revealed that the CASTRO DTO sells blue, pink, purple, green, and yellow varieties of suspected fentanyl.

### 2.     The CASTRO DTO Sells Numerous Types of Fentanyl and Operates Primarily from Two Locations in the East Bay

27.     The investigation has revealed that CASTRO distributes fentanyl from his two residences, which are located on 45th Avenue in Oakland, California and Washington Avenue in

---

[3] Drug Enforcement Administration.  2019 National Drug Threat Assessment, December 2019, pp. 9-11, available at https://www.dea.gov/sites/default/files/2020-02/DIR-007-20%202019%20National%20Drug%20Threat%20Assessment%20-%20low%20res210.pdf (last accessed Dec. 7, 2020).

[4] Synthetic Opioid Overdose Data, Centers for Disease Control and Prevention, available at https://www.cdc.gov/drugoverdose/data/synthetic/index.html (last accessed May 20, 2020).

[5] Drug Overdose Deaths, Centers for Disease Control and Prevention, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last accessed May 20, 2020).

San Leandro, California.[6]  Based on communications intercepted to and from the Target
Telephones, I estimate that CASTRO has filled over 100 orders for suspected fentanyl between
approximately April 21, 2021 and May 19, 2021.

28.     In a typical transaction, a re-distributor will place a phone call or text message to
CASTRO requesting a specific amount of suspected fentanyl, often referred to by the weight,
dollar amount and/or color(s) desired.[7]  The re-distributor and CASTRO will then discuss a time
and location for the delivery or pickup of the suspected fentanyl.  If CASTRO is at his residence
in San Leandro, he or one of his two runners—ROSALES-MONTES and CRUZ-CACERES—
will usually meet the customer at the "gas station" or "car wash," which is located nearby.  The
customer will text or call CASTRO when he or she is at the designated meeting location and
CASTRO or one of his couriers will meet the customer and engage in a hand-to-hand
transaction.[8]

29.     After observing multiple hand-to-hand transactions and intercepting
communications about suspected drug trafficking, law enforcement conducted a vehicle stop on
one of the suspected re-distributors.  Inside the vehicle, they found powdery substance suspected
to be fentanyl in the approximate quantity ordered in the intercepted communications.
Subsequent presumptive testing on at least one of the seized items was positive for the presence
of fentanyl.

   **B.     Core Members of the CASTRO DTO: CASTRO Conspires with ROSALES-
           MONTES and CRUZ-CACERES to Distribute Fentanyl**

30.     Investigators have intercepted several calls between CASTRO and re-distributors

---

[6] Oakland and San Leandro are both in the Northern District of California.  Investigators
conducting physical surveillance and monitoring location information from CATRO's
telephones have observed that CASTRO generally stays overnight at these locations.

[7] While CASTRO sometimes speaks with re-distributors in code, in some phone calls the
word "fent," which I believe to be short for fentanyl, is explicitly stated.

[8] A "hand-to-hand" transaction or drug-deal is typically an in-person exchange of
narcotics for cash.  Based on my training and experience, this is a common manner of
transferring drugs to avoid involving third-parties and/or commercial delivery services, which
run the risk of others uncovering the illegal conduct.

in which CASTRO stated that "guys" would transport the product ordered to the re-distributor. On numerous occasions after these phone conversations, investigators observed one or both of two men leave one of CASTRO's residence.  Investigators later identified these men as ROSALES-MONTES and CRUZ-CACERES through physical surveillance, information ROSALES-MONTES and CRUZ-CACERES provided to law enforcement, and DMV records, as well as intercepted communications via the Target Telephones.  On one occasion, as described below, investigators intercepted approximately eight ounces of fentanyl that was being transported by ROSALES-MONTES and CRUZ-CACERES to a re-distributor.

> **1.    *Investigators Intercept a Fentanyl Order Placed by UM-5074 to CASTRO and Interdict its Delivery by ROSALES-MONTES and CRUZ-CACERES***

31.     On or about April 29, 2021, at approximately 4:26 p.m., CASTRO received a call from an unknown male using a telephone number ending in 5074 (hereinafter referred to as "UM-5074").  The following is a summary of a portion of the call:[9]  UM-5074 asked CASTRO if he still had any of the "yellow kind."  CASTRO acknowledged he did.  UM-5074 asked CASTRO if he could drop "8" of the "yellow" to him.  CASTRO told UM-5074 that his "guys" were out running errands but that he would send them when they got back.

32.     Based on my training, professional experience, and participation in this investigation, I believe that CASTRO agreed to sell UM-5074 eight ounces of "yellow" fentanyl to UM-5074.  Further, I believe CASTRO told UM-5074 he would send his drug-runners (i.e., his "guys," CRUZ-CACERES and ROSALES-MONTES) to drop off the fentanyl.

33.     At approximately 4:30 p.m., investigators initiated surveillance at CASTRO's residence on 45th Avenue in Oakland, California, where investigators believe CRUZ-CACERES

---

[9] The descriptions of intercepted calls and quotations are based on initial summaries prepared by monitors.  As such, it is possible that there will be some discrepancies between the descriptions set forth in this Affidavit, and the final transcripts if/when those transcripts are prepared.  In most cases, only portions of the selected telephone calls and text messages have been summarized or quoted.  Further, some conversations occurred in Spanish and were summarized in English by Spanish-speaking monitors.

and ROSALES-MONTES also reside.[10]  Investigators observed a 2013 Honda Civic, registered to  ROSALES-MONTES, parked in front of the residence.

34.     At approximately 5:50 p.m., investigators observed ROSALES-MONTES and CRUZ-CACERES, enter the Honda Civic and drive away.  Surveillance units followed the vehicle and maintained constant surveillance.

35.     At approximately 6:05 p.m., the California Highway Patrol ("CHP") observed a broken brake light on the Honda Civic and conducted a traffic enforcement stop near Foothill Boulevard and 64th Avenue in Oakland, California.  CHP identified the driver as Jose Ivan Cruz CRUZ-CACERES and the front passenger as Elmer ROSALES-MONTES.  CHP conducted a records inquiry and determined that CRUZ-CACERES did not possess a valid driver's license. CHP issued CRUZ-CACERES a citation and towed the vehicle.  CHP conducted an inventory search of the vehicle and found nothing of evidentiary value.

36.     At approximately 6:34 p.m. the same day, CASTRO called UM-5074.  CASTRO told UM-5074 to give him a little more time because his "guy" got pulled over by the police. CASTRO told UM-5074 that his "guys" had UM-5074's "stuff."  CASTRO said one of the guys was stubborn and did not "hide the work."  CASTRO told UM-5074 he would call him if anything happened.

37.     I know based on my training, professional experience, and participation in this investigation, that drug dealers often use coded language to describe the type of narcotic and quantity of narcotic to be sold.  Further, I know that drug dealers often use the term "work" to refer to the drugs they are trafficking.  Specifically, in this investigation, investigators have intercepted numerous communications involving CASTRO in which the term "work" appears to be used to refer to fentanyl based on the context of the communications.  I believe that CASTRO

---

[10] Investigators believe CRUZ-CACEDES and ROSALES-MONTES reside at CASTRO's residence on 45th Avenue in Oakland based on observing them entering/leaving the residence on numerous occasions.  CRUZ-CACEDES and ROSALES-MONTES also have vehicles registered to the same address.  Further, they told CHP they lived at that address during the traffic stop discussed herein.

is informing UM-5074 that he was concerned that his drug runners, ROSALES-MONTES and CRUZ-CACERES, did not sufficiently conceal UM-5074's order of fentanyl within their vehicle (i.e., they did not "hide the work") and that law enforcement would locate the narcotics.

38.     At approximately 7:37 p.m., CASTRO called UM-5074.  CASTRO told UM-5074 that the police "took the car" and that the "work" was in there.  CASTRO explained that he still has "work" and would get it ready and send it to him.  Here, I believe CASTRO told UM-5074 that he had additional fentanyl and could still supply UM-5074 with a new delivery.

39.     After this call, I obtained a search warrant for Honda Civic and law enforcement executed it at approximately 9:50 p.m.  Inside the glove box of the Honda Civic, a detective found a blue towel.  While unraveling the towel, the detective located a plastic bag containing a pink powdery substance, which he suspected was fentanyl based on his training and professional experience.  Behind the blue towel, the detective located a black plastic bag that contained a large amount of a white/yellow powdery substance, which he suspected was a different type of fentanyl, based on his training and professional experience.

40.     Presumptive testing was subsequently preformed on a sample of the powdery substance found in the Honda Civic and the test was positive for the presence of fentanyl.  The gross weight of the fentanyl found in the Honda Civic was approximately 443 grams.

41.     Based on my training and experience, I know that drug trafficking organizations often use couriers to deliver controlled substances to re-distributors.  The couriers often receive payment for their work or a portion of the proceeds.  And, the couriers typically know they are transporting controlled substances because they must ensure they deliver the right quantity, receive the appropriate amount of money in exchange from the buyer, and/or communicate with the buyer if he/she has questions about the product.

42.     Here, I believe ROSALES-MONTES and CRUZ-CACERES are serving as couriers/co-conspirators in the CASTRO DTO.  This conclusion is based on a number of facts and information, including, but not limited to: my training and experience, the intercepted communications via the Target Telephones, the timing of ROSALES-MONTES and CRUZ-

CACERES leaving the 45th Avenue residence, and the quantity of fentanyl found inside the Honda Civic, and ROSALES-MONTES and CRUZ-CACERES were likely en route to make the delivery to UM-5074 at the time of the CHP stop.  In short, I believe that ROSALES-MONTES, CRUZ-CACERES, and CASTRO conspired and agreed to distribute fentanyl to other people in the Northern District of California.  I believe that the conspiracy is continuing and continued through at least May 19, 2021 based on the facts described below as well as the fact that investigators have intercepted calls to or from the Target Telephones consistent with the CASTRO DTO continuing to distribute fentanyl to re-distributors as recently as May 19, 2021.

C.    **TAWASHA Purchases Fentanyl from CASTRO on or about April 27, 2021, which TAWASHA Possessed with Intent to Distribute**

43.    During the course of this wiretap investigation, investigators have intercepted communications between TAWASHA and CASTRO consistent with TAWASHA purchasing approximately seven to ten ounces of fentanyl from CASTRO on two separate occasions.

44.    On or about April 27, 2021, in the early morning hours, FBI intercepted the following text messages between CASTRO and the user a telephone number ending in 8080, who investigators subsequently identified as TAWASHA:[11]

| | |
|---|---|
| TAWASHA: | Im on my way |
| TAWASHA: | Can you meet me tonight or should I wait? |
| TAWASHA: | Ill take one blue and 6'yellow |
| CASTRO: | Ok |
| TAWASHA: | U have one blue forsure? |
| CASTRO: | Yes sir |
| CASTRO: | Yes but not tomorrow I'm going to get some blue, possibly at 9 in the morning I can go deliver it to your house tomorrow night. |
| TAWASHA: | Me no comprende? |
| TAWASHA: | U have it tonight or no? |
| CASTRO: | I mean today at 8 in the morning, possibly at 10 in the morning I'm going to get a good amount of blue, so I could go deliver it to you at night at your place. |
| CASTRO: | Yes 1 blue |
| TAWASHA: | Oh ok |
| TAWASHA: | Ill Be there in 45 min |

_____

[11] A phone was seized from TAWASHA during his arrest on or about April 29, 2021, which is described below.  Detectives reviewed the seized phone and determined the telephone number associated with the phone was the telephone number ending in 8080.  Further, I obtained subscriber information for the telephone number ending in 8080 from T-Mobile and the subscriber is listed a Jihad Tawasha.

TAWASHA:   45?
CASTRO:     I'm going to put my phone on speakerphone, call me when you're here.
TAWASHA:   Ok i
TAWASHA:   20

45.    Shortly after these text communications, at approximately 2:47 a.m., CASTRO received an incoming call from TAWASHA. Due to the time of the call, it was not monitored. Investigators reviewed CASTRO's GPS ping location data which showed his phone at his 45th Avenue residence in Oakland, California, which is within the Northern District of California.

46.    On or about April 27, 2021, in the late evening, FBI intercepted the following text messages between CASTRO and TAWASHA:

TAWASHA:   U get blue
CASTRO:     I still think I have about 3 left, possibly two I'm not sure, but I do have two, possibly I have three.
TAWASHA:   Can you save them for me please? I will get them in the morning. 100%
CASTRO:     Ok sir

47.    Based on my training and experience I know that drug dealers often use coded language to describe the type of narcotic and quantity of narcotic to be sold. I also know that drug dealers often refer to quantities of narcotics with short-hand numbers and that re-distributors often deal in ounces. In the first conversation, I believe that CASTRO agreed to sell one ounce of "blue" fentanyl and six ounces of "yellow" fentanyl. Based on my training and professional experience, I believe the amount of suspected fentanyl involved in the transaction (i.e., approximately seven ounces) is consistent with distribution quantities of the controlled substances and is much greater than the amount a drug addict would typically purchase for personal use. I believe that CASTRO distributed fentanyl to TAWASHA in the early morning hours of April 27, 2021 and that TAWASHA possessed the fentanyl for purposes of distributing it to others. In the conversation late in the evening the same day, I believe CASTRO agreed to sell TAWASHA two to three additional ounces of "blue" fentanyl and that TAWASHA planned to pick up the fentanyl from CASTRO the following morning.

48.    On or about April 29, 2021, Modesto Police Department ("MPD") officers observed a Volkswagen sedan (hereinafter "the Volkswagen") pull into a gas station parking lot.

A man sitting in the front passenger seat got out of the vehicle and began walking through the parking lot, where he met another man and appeared to conduct a hand-to-hand transaction. The man who had got out of the passenger seat of the Volkswagen then got into the passenger seat of another vehicle and left the parking lot.

49.     The Volkswagen left the parking lot and MPD followed it. Officers stopped the Volkswagen after they observed it speeding. The driver, who was subsequently identified as TAWASHA, identified himself to officers as Joey Tawasha and provided a birth date in 1979.[12] Officers thought the driver appeared much younger than someone born in 1979 and saw a folded piece of foil back on the floorboard, which the officer believed to be drug paraphernalia based on his training and experience. The officer asked TAWASHA to retrieve the foil and hand it to him so he could inspect it. TAWASHA grabbed the foil and told the officer it was nothing, but he did not hand it to the officer. The officer saw black, burnt, residue on the foil, which he suspected was residue resulting from smoking heroin from the foil. The officer told TAWASHA he was being detained asked him to step out of the vehicle. When TAWASHA stepped out of the vehicle, the officer saw that TAWASHA had been sitting on a plastic bag that was full of multiple bindles of a white powdery substance. While the officer believed the white powdery substance was cocaine, a sample from the powder was subsequently tested and found to contain fentanyl. Multiple plastic bags of the white powdery substance were weighed individually, and the total gross weight of the bags was approximately 137 grams. This quantity is consistent with a distribution amount of the controlled substance based on my training and experience.

50.     Officer's found a California Identification card in TAWASHA's wallet with the name of Jihad TAWASHA. According to a records inquiry, TAWASHA was on Post Release Community Supervision ("PRCS") and had three outstanding warrants for his arrest. TAWASHA was also found to be in possession of $2,319 dollars. Based on my training and experience, individuals engaged in distributing narcotics often carry large amounts of cash that is

---

[12] TAWASHA's actual birth date is in 1987.

the proceeds of their drug trafficking activity or for the purpose of purchasing additional narcotics for sale.

51.    I reviewed a criminal history report for TAWASHA.  According to the report, TAWASHA has been convicted of multiple drug-related offenses, including a conviction in 2020 for possessing/purchasing for sale a narcotic or controlled substance, in violation of California Health and Safety Code § 11351.

52.    Based on my training and experience and the facts described in this affidavit, I believe that TAWASHA knowingly possessed the fentanyl found in the Volkswagen for the purposes of distributing it to other people.  Further, based on the communications intercepted between CASTRO and TAWASHA on or about April 27, 2021 and the fact that TAWASHA was found in possession of over 100 grams of fentanyl on or about April 29, 2021, I believe that TAWASHA purchased the fentanyl found in the Volkswagen from CASTRO and TAWASHA had obtained it within the Northern District of California with the intent to distribute it to others.

### D.    FERNANDEZ-REYES and CRUZ-CALIX Conspire to Distribute Fentanyl

53.    During the course of this investigation, investigators have intercepted communications via the Target Telephones between CASTRO and two individuals, FERNANDEZ-REYES (a female) and CRUZ-CALIX (a male).  These interceptions are consistent with FERNANDEZ-REYES and/or CRUZ-CALIX purchasing fentanyl from CASTRO on multiple occasions, generally every few days in amounts between five and eighteen ounces.  These interceptions include the timeframe of April 30 to May 11, 2021.  As outlined below, I believe there is probable cause to conclude that FERNANDEZ-REYES and CRUZ-CALIX are conspiring with each other to distribute fentanyl to other people and CASTRO is their source of supply.

54.    On April 30, 2021, at approximately 5:47 p.m., FBI intercepted text messages in Spanish between CASTRO and the user of a telephone number 5851.  Agents subsequently identified FERNANDEZ-REYES and CRUZ-CALIX as users of the telephone number ending in 5851.  Translations of the text messages follow:

GILFRY AFF. IN SUPPORT OF CRIMINAL COMPL.
[UNDER SEAL]                                16

5851:      May I see you near your house?
CASTRO:   Yes of course.

55.      At approximately 6:27 p.m., CASTRO received a call from FERNANDEZ-REYES.[13]  FERNANDEZ-REYES told CASTRO that they were outside.  CASTRO replied that he was on his way.

56.      At approximately 6:35 p.m., surveillance units observed a white Nissan sedan in front of the residence at 45th Avenue in Oakland, which is used by CASTRO, CRUZ-CACERES, and ROSALES-MONTES.  Surveillance units recognized FERNANDEZ-REYES in the driver's seat of the Nissan and CRUZ-CALIX in the front passenger seat.[14]

57.      Investigators saw CASTRO exit his residence and meet with FERNANDEZ-REYES and CRUZ-CALIX for a short time before CASTRO returned to his residence and the Nissan left the area.

58.      At approximately 7:16 p.m., CASTRO called FERNANDEZ-REYES.  CASTRO told FERNANDEZ-REYES that he did not have any "blue" because it was too expensive, and he only makes a $500 profit out of every kilo (i.e. kilogram).  FERNANDEZ-REYES told CASTRO that she needed "two green, one purple, and two yellow."  CASTRO told FERNANDEZ-REYES he would get it ready and see FERNANDEZ-REYES shortly.  CASTRO then asked FERNDANDEZ-REYES if she was at the car wash and proceeded to discuss whether she was at the car wash or a gas station.

59.      During the investigation, investigators have observed CASTRO and his couriers engaging in hand-to-hand transactions on multiple occasions at a car wash and a gas station near CASTRO's residence in San Leandro after setting up a fentanyl transaction in intercepted

_____

[13] Agents believe that the female voice heard using the telephone number ending in 5851 during intercepted communications is FERNANDEZ-REYES and the male voice is CRUZ-CALIX based on visual surveillance in connection with intercepted communications.

[14] Investigators have identified CRUZ-CALIX and FERNADNEZ-REYES based on a review of prior booking photographs of these individuals.  They were later positively identified by investigators as the male and female in the Nissan sedan.

communications.

60.     At approximately 7:35 p.m. and 7:38 p.m., the telephone number ending in 5851 and CASTRO exchanged the following text messages, which have been translated from Spanish:

5851:       I'm at the gas station
CASTRO:     I'll meet you there.

61.     At approximately 7:44 p.m., surveillance units observed the same Nissan sedan park at the station located on the corner of Castro Street and Washington Avenue in San Leandro, California.

62.     At approximately 7:55 p.m., surveillance observed CASTRO leave his residence and walk to the Nissan sedan.  CASTRO made contact the occupants and then walked back to his residence.

63.     Based on my training, professional experience, and participation in this investigation, I believe that CASTRO agreed to sell two ounces of "green" fentanyl, one ounce of "purple" fentanyl, and two ounces of "yellow" fentanyl.  Further, I believe CASTRO delivered the fentanyl to FERNANDEZ-REYES and CRUZ-CALIX at the gas station near CASTRO's residence in San Leandro.  Based on the amount of fentanyl ordered and the fact that FERNANDEZ-REYES ordered similar amounts of fentanyl on numerous occasions in intercepted communications, I believe that FERNANDEZ-REYES and CRUZ-CALIX purchased the fentanyl from CASTRO for the purpose of distributing it to others.

64.     The Nissan sedan left the parking lot and investigators followed it to a location in Oakland, where investigators saw the Nissan sedan park and FERNANDEZ-REYES and CRUZ-CALIX exit the vehicle and enter a residence.

65.     I was informed by DEA that FERNANDEZ-REYES and CRUZ-CALIX were in a dating relationship since early 2021 based on information obtained during a separate investigation.  I conducted an open source search and located a Facebook account that was set to public under the name "Mario Cruz."  The profile photograph for the account depicts FERNANDEZ-REYES and CRUZ-CALIX hugging.  The relationship status of the account lists

married to "Lizeth Fernandez."[15]  I viewed the "Lizeth Fernandez" account and believe that it belongs to FERNANDEZ-REYES based on the fact that nearly all of the photographs are of FERNANDEZ-REYES, including "selfie" photographs.

66.    On May 5, 2021, at approximately 9:31 p.m., CASTRO received a phone call from CRUZ-CALIX.  CRUZ-CALLIX told CASTRO that he was on his way to Oakland to pay him.  FERNANDEZ-REYES is heard in the saying that they are ten minutes away.  CASTRO said he was in San Leandro and did not know when he was going back to Oakland. FERNANDEZ-REYES came on the line and told CASTRO that she needed some of the "yellow" one.  CASTRO told FERNANDEZ-REYES to go to San Leandro instead if she needed something.

67.    On May 5, 2021, CASTRO called the telephone number ending in 5851 and CRUZ-CALIX answered.  CRUZ-CALIX told CASTRO that a woman in Daly City called because she wanted a large amount and wanted it right away so they went out there.  CASTRO told CRUZ-CALIX that it was fine and they could meet in Oakland.  FERNANDEZ-REYES came on the line and told CASTRO she would see CASTRO early in the morning and the she needed the "yellow" one.

68.    Based on my training, professional experience, and participation in this investigation, I believe that CASTRO agreed to sell FERNANDEZ-REYES an unknown amount of "yellow" fentanyl and I believe CRUZ-CALIX and FERNANDEZ-REYES needed the narcotics to re-distribute to their customers, such as the woman in Daly City.

69.    On May 10, 2021, at approximately 9:35 p.m., CASTRO received a phone call from CRUZ-CALIX.  CASTRO told CRUZ-CALIX that he just sent "the guys" to "pick that shit up" and they should be back in fifteen minutes.  CRUZ-CALIX told CASTRO he would head to CASTRO's house.  CASTRO asked CRUZ-CALIX to call him in about ten to fifteen minutes to confirm CASTRO would have it ready.  CRUZ-CALIX said that he would head to CASTRO's

---

[15] As described above, FERNANDEZ-REYES' and CRUZ-CALIX's full names are Yeny **Lizeth FERNANDEZ**-REYES and **Mario CRUZ**-CALIX.

house and wait outside.

70.     As discussed previously, CASTRO regularly refers to his drug runners, CRUZ-CACERES and ROSALES-MONTES, as his "guys."  Here, I believe CASTRO was indicating that his drug runners were picking up fentanyl that CASTRO could sell to CRUZ-CALIX.

71.     At approximately 11:00 p.m., CASTRO called CRUZ-CALIX.  CASTRO asked CRUZ-CALIX how much of the "colors" he would need.  CRUZ-CALIX told CASTRO he would need to call his wife to see what she says.  When CRUZ-CALIX referred to his wife, I believe he was referring to FERNANDEZ-REYES based on facts previously described in this Affidavit.

72.     At approximately 11:07 p.m., CASTRO called CRUZ-CALIX.  CASTRO asked CRUZ-CALIX what his wife said.  CRUZ-CALIX told CASTRO he could not get a hold of her, but to give him "all the colors."  CASTRO asked CRUZ-CALIX how much because he had a "shit load of work" in the kitchen.  CRUZ-CALIX told CASTRO he would take "six yellow" and the rest in other colors.  CRUZ-CALIX told CASTRO that he needed "18."  CASTRO told CRUZ-CALIX to meet him soon.

73.     Based on my training, professional experience, and participation in this investigation, I believe that in the communication described above CRUZ-CALIX ordered eighteen ounces of fentanyl from CASTRO.

74.     At approximately 11:43 p.m., CRUZ-CALIX called CASTRO.  CRUZ-CALIX told CASTRO that he was outside.  CASTRO told CRUZ-CALIX he would be outside shortly.

75.     At around the same time, surveillance units observed CASTRO exit his residence on 45th Avenue in Oakland, California and approach a 2016 Nissan Altima (hereinafter "the Altima").  CASTRO got in the vehicle for a short period of time before getting out and going back inside his residence.

76.     Surveillance units followed the Altima until Alameda County Sheriff's Office ("ACSO") deputies traveling in a patrol vehicle identified California Vehicle Code violations and conducted a traffic enforcement stop.  A deputy identified the driver, and sole occupant of

the vehicle as CRUZ-CALIX and conducted a records check, which revealed that CRUZ-CALIX had an outstanding felony warrant and did not have a valid driver's license.

77.     A deputy conducted a pat search of CRUZ-CALIX's person and located a baseball-sized bag filled with a white crystalline substance, which the deputy suspected was methamphetamine based on his training and professional experience.  CRUZ-CALIX admitted the substance was "crystal," a common slang term used for methamphetamine.

78.     ACSO searched the Altima but did not find any fentanyl inside the cabin.  CRUZ-CALIX was arrested and the Altima was towed to an impound lot.

79.     On May 11, 2021, a search warrant was obtained and executed for the Altima. Inside the Altima, investigators found a black grocery bag underneath the front driver's seat. Inside the black grocery bag, investigators found five separate clear bags containing suspected fentanyl in different colors.  Two of the bags appeared to contain white fentanyl while, one bag appeared to contain pink fentanyl, one bag appeared to contain purple fentanyl, and one bag appeared to contain green fentanyl.  The total gross weight of the fentanyl seized was approximately 19.6 ounces.  Presumptive testing was conducted on a sample of the suspected fentanyl found in the Altima and the sample tested positive for the presence of fentanyl.

80.     I learned from other law enforcement officers that, in 2020, FERNANDEZ-REYES was arrested approximately seven times in San Francisco for drug trafficking related offenses.  I also learned that a federal complaint was authorized on or about January 29, 2021, charging FERNANDEZ-REYES with distribution of heroin and possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and that FERNANDEZ-REYES was released from custody pending trial following a detention hearing.

81.     Based on my training and experience and the facts described in this Affidavit, I believe that FERNANDEZ-REYES and CRUZ-CALIX conspired and agreed at least between on or about April 30, 2021 and May 11, 2021 to distribute fentanyl to other people and carried out their conspiracy by purchasing fentanyl from CASTRO.  Further, I believe that CRUZ-CALIX possessed the fentanyl seized from the Altima for the purpose of distributing it to other people

and that the fentanyl was involved in FERNADEZ-REYES' and CRUZ-CALIX's conspiracy.

**E.**    **BORGES Purchased Fentanyl from CASTRO on or about May 6, 2021, which BORGES Possessed with Intent to Distribute**

82.    During the course of this investigation, investigators intercepted communications via the Target Telephones between BORGES and CASTRO consistent with BORGES purchasing fentanyl from CASTRO on multiple occasions.  When BORGES has placed an order for fentanyl, she has typically requested between nine and twelve ounces of fentanyl.  These quantities are consistent with distribution-level amounts of the controlled substance.

83.    On May 6, 2021, beginning at approximately 5:18 p.m. and ending at approximately 5:51 p.m., FBI intercepted the following text messages between CASTRO and the user a telephone number ending in 3160, who investigators had previously identified as BORGES:[16]

| | |
|---|---|
| BORGES: | Hey Baby Im here and I need 12!! |
| CASTRO: | Sorry I had not seen your message Well I will confirm exactly, how much I have at the moment it is not possible that it has 12 ounces, but I will let you know. |
| BORGES: | I asked you for 12 at 2pm and you said ok baby!! Fuck I hope you do! |
| CASTRO: | Hey, I'm exactly 10 ounces right now and I can give you the extra G days he has left. |
| BORGES: | Wait what?! So you only have 10?! |
| BORGES: | Extra G days he has left?! I dont understand that part. |
| CASTRO: | I repeat, I want to say that I have exactly 10 ounces and I had ten more grams left on those days G I will give it to you for free |
| BORGES: | Alright baby thank you! Im hear! |

84.    At approximately 5:50 p.m., surveillance units observed CASTRO get in his white Dodge Charger in front of his residence on 45th Avenue in Oakland and drive away. Surveillance units followed CASTRO to a location on Foothill Boulevard in Oakland, while maintaining constant surveillance.

---

[16] On or about April 25, 2021, an unknown female, using the telephone number ending in 3160, ordered ten ounces of suspected fentanyl.  Agents subpoenaed the phone number and learned the subscriber was "Heather BORGES." A search of law enforcement databases and open sources identified Heather BORGES, vehicles registered to her, and a driver's license photograph.  As described below, agents saw a woman who appears to be the same person depicted in BORGES' driver's license in a car that met CASTRO after the telephone number ending in 3160, was used to order suspected fentanyl from CASTRO.

85.    At approximately 5:56 p.m., CASTRO sent BORGES a text message that stated, "Here."

86.    Surveillance units observed BORGES walking from the direction of a parked white Mazda CX-9 (hereinafter "the CX-9") that was parked near where CASTRO had driven. BORGES got in the front passenger seat of CASTRO's Dodge Charger. The Dodge Charger then drove around the area for a brief amount of time before returning to where the CX-9 was parked. Once back in the area, BORGES exited the white Dodge Charger and got back inside driver seat of the Mazda CX-9.

87.    The CX-9 left the area and surveillance units followed, maintaining constant surveillance, to the area of Grizzly Peak Boulevard, where the vehicle pulled to the shoulder of the roadway and parked for approximately an hour. After approximately an hour, the CX-9 drove back in the direction it came. At this time, Contra Costa County Sheriff's Office ("CCCSO") deputies observed the CX-9 fail to stop completely at a stop sign in Oakland, California and conducted a traffic stop. When the CX-9 pulled over it was in Berkeley, California.

88.    A CCCSO deputy approached the vehicle and identified its four occupants. BORGES was sitting in the rear passenger area behind the driver's seat. The CX-9's driver admitted that she had ran the stop sign, that she did not have a valid driver's license, and the information on her Oregon identification card was not current. The deputy asked the driver to step out of the vehicle so that he could speak with the driver at his patrol car to get her current information for the traffic citation. While one of the deputies was filling out the citation, the other deputy spoke with the driver and the driver told him that there was "crank" and "heroin" in the CX-9.

89.    CCCSO searched the CX-9 and found a black lock box with a magnet attached to the top of it on the front passenger side floorboard. Inside, they found a bag of suspected fentanyl, a bag containing suspected heroin, and a bag of suspected methamphetamine. Deputies also located a plastic case on the rear floorboard behind the driver's seat where BORGES was

seated in the vehicle.  Deputies forced the case open and located approximately one half-pound of suspected fentanyl and a digital scale.  During the search, BORGES claimed that she did not know what was in the case and that she had been paid to take it to Oregon.

90.     Presumptive testing was conducted on a sample of the suspected fentanyl found in the locked plastic case where BORGES had been sitting and the sample tested positive for the presence of fentanyl.  The fentanyl in the plastic case that was found where BORGES had been sitting was weighed and it weighed approximately 233 grams gross.  The suspected fentanyl found in the front passenger area of the CX-9 weighed approximately 56 grams gross.

91.     I reviewed a criminal history report for BORGES.  The report indicates that BORGES has been convicted of numerous controlled substance-related offenses, including 2016 and 2017 convictions for transporting or selling a controlled substance, in violation of California Health and Safety Code § 11352(a).

92.     Based on my training and experience and the facts described herein, including the amount of fentanyl BORGES ordered on intercepted communications, the amount of fentanyl found where BORGES was sitting in the CX-9, and the fact that BORGES possessed the fentanyl with a digital scale,[17]  I believe that BORGES knowingly possessed the fentanyl found in the CX-9 for the purposes of distributing it to other people.  I further believe that BORGES was potentially transporting the purchased fentanyl to Oregon to distribute in the state where she resides.

F.     **LAUGHREN Purchases Fentanyl from CASTRO on or about May 12, 2021, which LAUGHREN Possessed with Intent to Distribute**

93.     Investigators have intercepted numerous communications via the Target Telephones wherein LAUGHREN appears to order fentanyl from CASTRO.  LAUGHREN typically requested anywhere from a half ounce to an ounce of fentanyl.  In total, investigators believe that LAUGHREN has purchased over one half-pound of fentanyl from CASTRO since

---

[17] Based on my training and experience, I know that individuals engaged in distributing narcotics often use digital scales to weigh sale portions of drugs and ensure that they are providing their customer with the correct amount of drugs.

approximately April 21, 2021.  This quantity of fentanyl is consistent with a distribution-level of the controlled substance.

94.     On May 12, 2021, at 3:12 p.m., FBI intercepted a call to CASTRO from the user of a telephone number ending in 6855, who FBI had previously identified as LAUGHREN.[18] LAUGHREN asked CASTRO if he had a "half ounce."  CASTRO said he did. LAUGHREN told CASTRO he was going to come over in "20 minutes."

95.     At approximately 4:30 p.m., surveillance units observed a Volkswagen sedan (hereinafter, "LAUGHREN's Volkswagen"), park near CASTRO's residence on 45th Avenue in Oakland.  Surveillance units had been conducting surveillance on LAUGHREN earlier in the day and had observed him driving the vehicle.

96.     At approximately 4:30 p.m., LAUGHREN called CASTRO.  LAUGREN told CASTRO that he was parked outside and to come to his car so he could show CASTRO something.  CASTRO asked if LAUGHREN wanted "half."  LAUGHREN replied, yes, just a half.

97.     Shortly afterwards, investigators observed CASTRO exit his residence on 45th Avenue in Oakland, approach LAUGHREN, and appear to give him something in a manner consistent with a hand-to-hand drug transaction.

98.     At approximately 4: 41 p.m., CASTRO and LAUGHREN parted ways. Surveillance units followed LAUGHREN's Volkswagen and maintained constant surveillance.

99.     At approximately 4:50 p.m., a CHP officer driving a marked patrol car observed the driver of the Volkswagen throw what appeared to be a cigarette out the window and conducted a traffic stop.

100.    The CHP officer asked LAUGHREN for his driver's license, registration, and

---

[18] FBI obtained subscriber information from the service provider for the telephone number that indicates that William LAUGHREN is the subscriber for the telephone.  Further, investigators have seen LAUGHREN meet with CASTRO in a manner consistent with meetings arranged with the telephone number ending in 6855.  Investigators have also seen LAUGHREN using his cellular phone at the same time investigators were intercepting a call between LAUGHREN and CASTRO.

proof of insurance, none of which LAUGHREN was able to provide. The CHP officer asked LAUGHREN to step out of the vehicle so that he could get a proper identification.

101.    LAUGHREN verbally identified himself to the CHP officer, who subsequently conducted a records inquiry. The records inquiry indicated that LAUGHREN had a suspended driver's license. The CHP officer searched LAUGHREN's person and found a clear plastic bag containing a white powdery substance. LAUGHREN told the officer that the powdery substance was cocaine.

102.    Later, presumptive testing was conducted on the seized substance and it tested positive for the presence of fentanyl.

103.    Based on my training and experience, as well as the facts described in this Affidavit, I believe there is probable cause to conclude that LAUGHREN knowingly possessed the fentanyl found during this stop, obtained it from CASRTRO, and intended to distribute it to others.

## **REQUEST TO SEAL**

104.    The Investigative Agencies criminal investigation of the Target Subjects is ongoing. In addition, it is my belief that prematurely revealing the specific details, facts, and reasons for the search, as detailed in this affidavit, may cause flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, and otherwise seriously jeopardize the investigation (e.g., prompting changes in behavior or notification of confederates). Accordingly, I request that the Court issue an order that the criminal complaint, this affidavit in support of the application for criminal complaint and arrest warrant, the application for the criminal complaint and arrest warrant, and the attachments thereto, along with the order itself, be filed under seal until further order of the Court.

//

//

//

## **CONCLUSION**

105.    Based on the information set forth in the paragraphs above, I submit that there is probable cause that the Target Subjects committed the crimes described above.


/s/ Joshua Gilfry

_____

JOSHUA GILFRY
Task Force Officer
Federal Bureau of Investigation


Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 24th day of May 2021.



HONORABLE KANDIS A. WESTMORE
United States Magistrate Judge